**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

BERNIE MULERO,

      Plaintiff,

          v.

OFFICER PATRICK JAMES WALSH and
OFFICER RONALD SHEPOSH,

      Defendants.

CIVIL ACTION NO. 3:15-CV-1406

(JUDGE CAPUTO)

## MEMORANDUM

Presently before this Court are two post-trial motions. Plaintiff Bernie Mulero has filed a Motion for Attorney's Fees and Costs (*Doc.* 74), and Defendant Officer Ronald Sheposh has filed a motion seeking qualified immunity, a new trial, or remittitur (*Doc.* 77). Defendant Sheposh's renewed motion seeking qualified immunity will be denied because a reasonable officer lacking reasonable suspicion of a crime would have known it was unreasonable to point his service weapon at a seemingly innocent bystander. Further, Defendant Sheposh will not be provided a new trial because a surveillance tape of the events at issue was properly excluded as a sanction for a discovery violation and no limiting instruction was necessary to avoid jury confusion. However, Defendant's request for remittitur will be granted in part and denied in part. Accordingly, the total award of compensatory damages will be reduced to $125,000. Finally, Plaintiff's Motion for Attorney's Fees and Costs will be granted in part and denied in part because Plaintiff's requested hourly rate for Attorney Harry Coleman was greater than the prevailing market rate and therefore not reasonable for the calculation of lodestar.

## I. Background

As the parties have already been through trial, only a brief summary of the facts necessary to resolve the instant motions will be provided.

This is a civil rights action brought pursuant to 42 U.S.C. § 1983, which stems from an encounter between Plaintiff Bernie Mulero and Defendants Officer Patrick James Walsh ("Walsh"), and Officer Ronald Sheposh ("Sheposh") on August 2, 2013.

On August 2, 2013, it is undisputed that Plaintiff traveled from his home in East Stroudsburg, Pennsylvania to the State Office Building in Scranton, Pennsylvania. (Trial Transcript on September 13, 2017 ("*Trans. II*"), at 3; Trial Transcript on September 12, 2017 ("*Trans. I*"), at 149.) Specifically, Plaintiff was heading to the Division of Vital Records because he needed to secure a copy of his son's birth certificate so that he could play on the local football team. When Plaintiff arrived at the State Office Building he parked his car in what he believed was the public parking lot for the Steamtown Mall. (*Trans. I*, at 149-150, 154.) In fact, the parking lot was not a part of the Steamtown Mall, but rather a private parking lot for employees working in the State Office Building.[1]

After parking his car, Plaintiff proceeded into the State Office Building and obtained his son's birth certificate. (*Trans. I*, at 150.) Upon receiving the birth certificate, he returned to his car and began preparing to exit the parking lot. While Plaintiff packed up his paperwork at the rear of his car, a car driven by Mr. Gary Gifford pulled up behind him. (*Id.*) Mr. Gifford began yelling to Plaintiff that he was in his assigned parking spot. (*Trans. I*, at 151.) Plaintiff claimed that Mr. Gifford began cursing at him, thus escalating a simple dispute over a parking space into a dramatic war of words. (*Id.*) At some point during this exchange, Mr. Gifford informed Plaintiff that he was a police officer and that he had called the police. (*Trans. I*, at 152, 154.) Plaintiff, admittedly upset, stated: "oh, so you [Gifford] have a gun and a badge . . . and now you assume that gives you the right [to curse at me.]" Plaintiff made hand motions simulating a gun and badge as he spoke. (*Trans. I*, at 153.)

---

[1]     Testimony at trial made clear that people routinely confused the private parking lot as a public lot associated with the Steamtown Mall. (*Trans. I*, at 113.)

Mr. Gifford did call the police, and he was connected with Defendant Walsh. (*Trans. I*, at 153.) Mr. Gifford told Defendant Walsh that there had been a verbal altercation in the parking lot adjacent to the State Office Building. (*Trans. I*, at 80.) He also claims to have told Defendant Walsh that the man he was arguing with–later identified as Plaintiff–could have a weapon. (*Id.*) Defendant Walsh relayed to Defendant Sheposh that there had been an altercation in the parking lot. (*Trans. II*, at 25.) Notably, however, Defendant Sheposh is uncertain whether Walsh had told him prior to going to the parking lot whether there was an actual gun on site or if there was only a "simulated handgun" made with an individual's thumb and pointer fingers. (*Trans. II*, at 25:10-12, 16-24.)

Plaintiff eventually returned to his car and waited for the police. (*Trans. I*, at 154-155.) Sometime after returning to his car, Plaintiff decided he did not want to wait any longer and pulled out of the parking space. (*Trans. I*, at 157.) As he drove towards the exit, Plaintiff claimed that he saw a person running towards his car. Then, as he turned to exit the parking lot, a man in uniform–Defendant Sheposh–positioned himself in front of Plaintiff's car and drew his weapon. (*Trans. I*, at 161, 165.) Plaintiff testified that the weapon was pointed directly at him, so he stopped his car. (*Id.*) Once the car was stopped, Defendant Walsh pulled Plaintiff from the vehicle. (*Trans. I*, at 170.)

At trail, Defendant Sheposh admitted to drawing his service revolver and pointing it directly at Plaintiff. (*Trans. II*, at 36-37.) Further, Defendant Sheposh admitted that he had no reasonable suspicion that Plaintiff had engaged in criminal activity. (*Trans*. II, at 28, 31, 33.) In fact, Defendant Sheposh stated he did not have a reasonable suspicion of criminal activity when he saw Plaintiff begin pulling out of the parking spot, when Plaintiff began driving out of the parking lot, or when he stepped in front of Plaintiff's car and trained his weapon on Plaintiff. (*Id.*)

On January 22, 2016 Plaintiff filed an Amended Complaint that asserted a claim

against Defendants Walsh and Sheposh under 42 U.S.C. § 1983 for the use of excessive force in violation of the Fourth Amendment.[2] Trial began on September 12, 2017 and lasted for three days.

During the course of the trial there were two notable requests made by the defense. First, after the presentation of the Plaintiff's case-in-chief and again prior to closing argument, Defendant Sheposh moved pursuant to Federal Rule of Civil Procedure 50(a) for a judgment as a matter of law claiming he was entitled to qualified immunity. (*Trans. II*, at 65, 116-17.) I denied this motion on both occasions. (*Trans. II*, at 69, 122.) Second, following Plaintiff's closing argument, Defendants requested a "limited instruction for the jury to instruct them that they [were] not to consider the veracity of the arrest of [Plaintiff]." (*Trans. III*, at 35.) I denied this request because the instruction I had already provided to the jury made no mention of the standard for false arrest and appropriately narrowed the issue before them to one of excessive force. (*Trans. III*, at 35-36.)

Ultimately, the jury found that Defendant Sheposh violated Plaintiff Mulero's Fourth Amendment right to be free from the use of excessive force. (*Doc.* 69.) Defendant Walsh was found not liable. (*Id.*) Further, the jury found that Plaintiff had "suffered actual injury as a result of the violation" and awarded Plaintiff $250,000 in compensatory damages. (*Id.*)

Both parties have filed post-trial motions. First, Plaintiff has filed a Motion for Attorney's Fees and Costs. (Doc. 74.) Defendant Sheposh opposed this Motion. Plaintiff's Motion has been fully briefed and is ripe for review. Second, Defendant Sheposh filed a post-trial motion on October 11, 2017. This motion presented a variety of issues that have been fully briefed. Thus, Defendant Sheposh's post-trial Motion is also ripe for review.

---

[2] The Amended Complaint included additional claims and parties that were eventually dismissed by stipulation. (*Docs*. 12, 14, 51.)

4

## II. Standard of Review

**A.     Federal Rule of Civil Procedure 50(b): Renewed Motion for Judgment as a Matter of Law**

Federal Rule of Civil Procedure 50(a) authorizes the entry of judgment as a matter of law. A motion for relief under this Rule may be made at anytime before the case is submitted to the jury. FED. R. CIV. P. 50(a)(2). Where, as here, a court denies a parties' Rule 50(a) motion, "the court is considered to have submitted the action to the jury subject to the courts later deciding the legal questions raised by the motion." FED. R. CIV. P. 50(b). In the event an adverse judgment is entered, the movant may renew the motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). Rule 50(b) provides:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motions. No later than 28 days after the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.

"In order to prevail, the moving party must show that the jury's findings, presumed or expressed, are not supported by substantive evidence, or if they [are], that the legal conclusions implied [by] the jury's verdict cannot in law be supported by the findings." *Moore v. Susquehanna Area Regional Airport Authority*, No. 2-0535, 2005 WL 2430790, at *2 (M.D. Pa. Sept. 30, 2005) (citing *Valenti v. Allstate Ins. Co.*, 243 F. Supp. 2d 221, 223 (M.D. Pa. 2003)).

> In considering whether the evidence at trial was sufficient to sustain the jury's verdict, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version. Although judgment as a matter of law should not be granted liberally, a mere scintilla of evidence is insufficient to sustain a verdict of liability. The Court is not to ask whether there is literally no evidence supporting the verdict, but instead whether there is evidence upon which the jury could properly find a verdict for the prevailing party. Accordingly, if

5

> the evidence of record is insufficient to support the jury's verdict, then motion for judgment as a matter of law should be granted.

*Id.* at *3 (citations omitted).

A motion for judgment as a matter of law should be granted if, "viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Ambrose v. Township of Robinson*, 303 F.3d 488, 492 (3d Cir. 2002) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)); *see also Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 209 (3d Cir. 2008).

**B.      Federal Rule of Civil Procedure 59: Motion for a New Trial**

Under Rule 59, motions for a new trial must be filed within twenty-eight (28) days of the date the judgment was entered. *See* FED. R. CIV. P. 59(b). After a jury trial, a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). Courts have granted motions for a new trial where: (1) there is a significant error of law, to the prejudice of the moving party; (2) the verdict is against the weight of the evidence; (3) the size of the verdict is against the weight of the evidence; or (4) counsel engaged in improper conduct that had a prejudicial effect on the jury. *See Maylie v. Nat'l R.R. Passenger Corp.*, 791 F. Supp. 477, 480 (E.D. Pa. 1992), *aff'd* 983 F.2d 1051 (3d Cir. 1992). The decision to grant a new trial is left to the sound discretion of the trial judge. *See Blackiston v. Johnson*, No. 91-5111, 1995 WL 563834, at *1 (E.D. Pa. 1995), *aff'd* 91 F.3d 122 (3d Cir. 1996), *cert. denied* 519 U.S. 953 (1996). Where the evidence is in conflict and subject to two or more interpretations, the trial judge should be reluctant to grant a new trial. *See Klein v. Hollings*, 992 F.2d 1285, 1295 (3d Cir. 1993).

**C.     Federal Rule of Civil Procedure 59(e): Remittitur**

"Under Rule 59(e), a party may seek alteration or amendment of the verdict." *Borrell v. Bloomsburg Univ.*, 207 F. Supp. 3d 454, 471 (M.D. Pa. 2016). "The rationalization for, and use of, the remittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive." *Spence v. Bd. of Educ. of Christina Sch. Dist*., 806 F.2d 1198, 1202 (3d Cir. 1986) (citations omitted). "The use of remittitur is committed to the sound discretion of the district court judge." *Hall v. Pennsylvania Dept. of Corrs.*, No. 02-1255, 2006 WL 2772551, at *20 (M.D. Pa. Sept. 25, 2006) (citing *Evans*, 273 F.3d at 354) (Vanaskie, J.). "[W]hen considering and fixing a remittitur, the court is to 'consider similar cases, evaluate the evidence, determine a damages figure related to that evidence, while being mindful that the determination of that amount may not be precisely calculated.'" *Borrell*, 207 F. Supp. 3d at 471 (quoting *Evans*, 273 F.3d at 352); *see also Hall*, 2006 WL 2772551 at *20 (citing *Delli Santi v. CNA Ins. Cos.*, 88 F.3d 192, 206 (3d Cir. 1996)). "The means employed should enable the Court to attain its objective of setting damages at the 'maximum recovery that does not shock the judicial conscience.'" *Hall*, 2006 WL 2772551 at *66-67 (quoting *Evans*, 273 F.3d at 355).

When a Court reduces a jury award because it believes the amount of the verdict is against the weight of the evidence, it must afford the plaintiff the option of a new trial. *Cortez v. Trans Union, LLC*, 617 F.3d 688, 716 (3d Cir. 2010).

### III. Discussion

**A. Defendant Sheposh's Post-Trial Motions**

(1)     Qualified Immunity:

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time

7

of the challenged conduct." *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The Third Circuit has remarked that qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." *Blackhawk v. Pa.*, 381 F.3d 202, 215 (3d Cir. 2004). "In considering the applicability of qualified immunity, courts engage in a two-pronged examination." *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. 2015). First, a court decides "whether the facts that a plaintiff has shown make out a violation of a constitutional right." *Id.* If at the conclusion of this analysis a court finds that no constitutional violation took place, then the court must enter judgment in the defendant's favor. However, if a constitutional violation is found, a court must then determine "whether the right at issue was 'clearly established[3]' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). If the right violated was "clearly established," then the official is not owed immunity.

As a preliminary matter, the first prong of this analysis has been satisfied. On September 14, 2017, a jury found that Defendant Sheposh "violated Mr. Mulero's Fourth Amendment right to be free from the use of excessive force." (*Doc.* 69.) Additionally, when providing Plaintiff, the non-movant, the advantage of every fair and reasonable inference, I find that the evidence presented was sufficient to support the jury's conclusion. *See Black v. Stephens*, 662 F.2d 181, 188-89 (3d Cir. 1981) (explaining that training a firearm at an individual may constitute excessive force if such action is not justified by the

---

[3]     "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle*, 132 S. Ct. at 2093. "[E]xisting precedent must have placed the statutory or constitutional question beyond debate" for a right to be clearly established. *Id.* The Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor*, 135 S. Ct. at 2044.

circumstances). Moreover, Defendant Sheposh does not appear to dispute that the first prong of the qualified immunity analysis has been satisfied. Thus, I will focus on whether Defendant Sheposh's conduct violated a clearly established right.

Before proceeding, I must "frame the precise contours" of the right at issue. *See Spady*, 800 F.3d at 638. This is required because the right must be framed in a "more particularized . . . sense in light of the case's specific context." *Id.*

Defendant Sheposh writes extensively in arguing that Plaintiff does not have a clearly established right that prohibits "an officer . . . from pointing his weapon at a *fleeing suspect* who is driving directly towards him." (*Doc.* 92, at 7 (emphasis added).) But, Defendant confuses the right at issue. Defendant neglects one critical fact: Plaintiff was never a suspect. Remember, Defendant Sheposh repeatedly testified that he had no reasonable suspicion that Plaintiff had committed any crime.[4] (*Trans*. II, at 28, 31, 33.) So, while the defense attempts to have me scour for precedent that supports the notion that a *fleeing suspect* may not be detained by use of force[5], my job is actually much simpler: I must

[4]     Even absent the explicit testimony of Defendant Sheposh–when the totality of the trial testimony is viewed to provide every reasonable inference in favor of Plaintiff as the non-moving party–it is fair to conclude that an objective officer in Defendant Sheposh's position would not have possessed a valid reasonable suspicion.

[5]     Defendant relies heavily on two cases to support his position that he is entitled to qualified immunity. First, Defendant cites *Mullenix v. Luna*, 136 S. Ct. 305 (2015). There, a Defendant State Trooper fired his weapon at a fleeing fugitive from an overpass in an attempt to stop the car. *Id.* at 306. Ultimately, however, the Trooper's actions resulted in the death of the fugitive. *Id.* The Supreme Court held that the Trooper was entitled to qualified immunity. *Id.* at 313. Similarly, Defendant cites *Clark v. Bowcutt*, an unpublished decision from the Tenth Circuit. 675 Fed. App'x 799 (10th Cir. 2017). In *Clark*, an officer encountered an individual urinating on the side of the road and suspected the individual had been driving under the influence of alcohol. *Id.* at 800. After interviewing the individual on the side of the road, the individual fled. *Id.* Following a low speed car chase, the officer had blocked the individual's path with the patrol car and exited his

determine whether it is well established that an individual has a right to be free from a use of force when a police officer lacks a reasonable suspicion that criminal activity is afoot.[6]

With respect to a use of force, it is well established that a reasonable officer is guided by the analysis set forth by the Supreme Court in *Graham v. Connor* and the Third Circuit in *Sharrar v. Felsing*. *See Estate of Smith v. Marasco*, 430 F.3d 140, 150 (3d Cir. 2005); *Couden v. Duffy*, 446 F.3d 483, 497 (3d Cir. 2006); *Green v. N.J. State Police*, 246 Fed. App'x. 158, 162-63 (3d Cir. 2007). In *Graham v. Connor*, the Supreme Court established a three-factor analysis to determine if a use of force was reasonable. 490 U.S. 386, 396 (1989). This analysis requires a balancing of: (1) the severity of the crime; (2) whether the suspect possesses an imminent threat to the safety of the police in the vicinity, and (3) whether the suspect attempts to resist arrest or flee the scene. *Id.* The Third Circuit expanded on *Graham* and concluded that officers should also balance "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the

---

vehicle to confront the suspect. *Id.* at 800-801. The suspect began driving his car towards the officer, and the officer discharged his weapon in self-defense. *Id.* at 801. Qualified immunity was provided to this officer because his action was not deemed "objectively unreasonable" by the Tenth Circuit. *Id.* at 810-11. Here, a single fact renders *Mullenix* and *Clark* inapposite: Mulero was not a suspect. Unlike the officers in *Mullenix* and *Clark*, Defendant Sheposh admits he had no reasonable suspicion that Mulero was engaged in criminal activity. (*Trans*. II, at 28, 31, 33.)

[6]     While this formulation of the right at issue may seem overly broad, it properly mirrors the simple facts before me. An officer proceeded into a parking lot and saw an individual driving a car towards the exit. The officer acknowledged he had no reasonable suspicion that the driver of the car had committed a crime. Absent a reasonable suspicion that criminal activity was afoot, the officer drew his weapon and pointed it at the driver. The driver stopped after noticing the officer in a "shooting stance" pointing the gun directly at him. There are no facts that make this a more particularized inquiry.

10

possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).

Applying the *Graham* and *Sharrar* factors it is obvious that a reasonable officer would not apply any degree of force against an innocent bystander, and thus any use of force is a violation of a well established right.[7] Defendant Sheposh readily admits that he had no basis to believe Plaintiff had committed–or was about to commit–a crime. (*Trans*. II, at 28, 31, 33.) He also admits that he trained his weapon on Plaintiff, and thus applied force to seize Plaintiff. (Trans. II, at 33, 36-37.)*; see Black*, 662 F.2d at 188-89 (explaining that merely pointing a firearm at a person may constitute excessive force if such action is not justified by the circumstances).[8] In other words, absent any suspicion, Defendant Sheposh used force to conduct a seizure. Few if any of the *Graham* or *Sharrar* factors weigh in favor

---

[7] In certain circumstances, officers may use force when they possess only reasonable suspicion and not probable cause. *See, e.g.*, *United States v. Trullo*, 809 F.2d 108, 113 (1st Cir. 1987) (permitting the use of a gun during a *Terry* stop when officers had a reasonable suspicion the suspect was engaged in criminal activity and armed); *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995) (explaining that the "use of guns and handcuffs most be justified by the circumstances," during an investigatory stop.)   But, no case stands for the proposition that a police office may use force against as innocent bystander.

[8] *See also Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995) (en banc denied) (finding excessive force where police trained their weapons on the innocent family members of a suspect to facilitate a search of the subjects home); *Robinson v. Solano Cty.*, 278 F.3d 1007, 1010, 1014 (9th Cir. 2002) (finding excessive force where officers pointed their weapons at an individual suspected of a misdemeanor); *McDonald v. Haskings*, 966 F.2d 292, 294-95 (7th Cir. 1992) (finding excessive force where an officer pointed a gun at an individual who was not suspected of any crime while a search was conducted of the family home); *Johnson v. Manchester Twp.*, No. 10-0805, 2011 WL 3882269, at *5 (D.N.J. Sept. 2, 2011) (Thompson, J.) (noting that the *Black* force definition applies when an officer intentionally points his firearm at an individual, and the individual knows the gun is pointed at him).

of finding that Defendant Sheposh made a reasonable decision to use force. A reasonable officer guided by *Graham* and *Sharrar* would have known not to use force in this case.

Further, it is well established that the Fourth Amendment prohibits the seizure of an individual without, at minimum, a reasonable suspicion of criminal activity. *See, e.g.*, *Terry v. Ohio,* 392 U.S. 1, 24 (1968) (allowing officers to conduct a brief, investigative seizure if they possess a reasonable suspicion that a suspect is armed and dangerous); *United States v. Cortez*, 449 U.S. 411, 417-18 (1981) (explaining that a police officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."); *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (noting that a "mere hunch is insufficient to justify a stop. . . ."). To overcome a claim of unlawful seizure, an officer must only show that he had an "arguable reasonable suspicion." *Cortez*, 449 U.S. at 418. If such a showing is made, the officer is entitled to qualified immunity. But, if an officer fails to justify his seizure with a particularized suspicion, immunity is not provided.

Here, I am not directly confronted with a claim of an unlawful seizure, but rather a claim of excessive force. Notably, these claims present distinct factual inquiries. *See Snell v. City of New York*, 564 F.3d 659, 672-73 (3d Cir. 2009) (citing *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004)). However, if a reasonable officer is expected to conclude that it is well settled that he is unable to seize an individual without at least a reasonable suspicion of criminal activity, then a reasonable officer must also conclude that it is well settled that he is unable to seize an individual *with force* absent reasonable suspicion or probable cause. *Cf. Dunn v. Graham*, *No. 14-1736, 2017 WL 5007902, at *5* n.7 (M.D. Pa. Nov. 2, 2017) (Caputo, J.) ("[I]f it is well established that an officer may not use excessive force when making an arrest, it is certainly well established that an officer may not use excessive force on an individual who has committed no crime.").

Defendant Sheposh will be denied qualified immunity because a jury found[9] that Plaintiff produced facts sufficient to show a constitutional violation, and I find that the right violated is well established. At bottom, an individual has the right to be free from a use of force by police when an officer has no reasonable suspicion the individual is engaged in criminal activity. To hold otherwise would serve to endorse an officer's lackadaisical use of a firearm anytime he wished to get the attention of a seemingly innocent passerby.

    (2)    <u>Exclusion of the Surveillance Video:</u>

Next, Defendant Sheposh argues he is owed a new trial because I erroneously prohibited admission of a surveillance video.

Federal Rule of Civil Procedure 26 requires the disclosure of certain information at the start of discovery. Specifically, this Rule requires parties to disclose, without request, "a copy–or a description by category and location–of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody or control and may use to support its claims or defenses, unless the use would be solely for impeachment." FED. R. CIV. P. 26(a)(1)(A)(ii). This disclosure must occur within fourteen (14) days following the parties case management conference. FED. R. CIV. P. 26(a)(1)(C). The Rules explicitly provide for sanctions if the mandates of Rule 26 are ignored. FED. R. CIV. P. 37(c)(1). "If a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use the information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *Id.* The burden of establishing that a failure to disclose was either substantially justified or harmless rests on the party facing a request for exclusion. *See R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262 (6th Cir. 2010); *Tolerico v. Home Depot*, 205 F.R.D.

---

[9]    I also find that the evidence submitted to the jury was sufficient to support the jury's conclusion.

169, 175 (M.D. Pa 2002) (Vanaskie, J.).

Notably, information used "solely for impeachment need not be disclosed pursuant to Rule 26(a)(1)(A), (C).[10] But, this exception to the broad rule favoring disclosure is quite limited. In fact, a number of courts have held that the impeachment exception is limited to evidence that has *no potential utility* other than impeachment. *See, e.g.*, *Standley v. Edmonds-Leach*, 783 F.3d 1276, 1283 (5th Cir. 2015) (explaining that the term "solely" modifying the word "impeachment" is to be interpreted strictly); *Chiasson*, 988 F.2d at 517-18 (holding that a video tape, "regardless of its impeachment value," must be disclosed because it is a the very least partially substantive); *Klonoski v. Mahlab*, 156 F.3d 255, 270 (1st Cir. 1998) (same).

Defendants were required by Rule 26(a) to disclose the surveillance video within 14 days of the case management conference. The parties participated in a Rule 26(f) case management conference on April 14, 2016. (*Docs*. 13, 17.) This means that disclosures required by Rule 26(a) were to be provided to opposing counsel no later than April 28, 2016. On August 18, 2017–the day of the final pre-trial conference–Defendants provided Plaintiff with a surveillance video that purported to document the events giving rise to the instant dispute. I decided, like the majority of courts confronted with this issue, that the video was both substantive and impeaching in nature.[11] Thus, the video should have been produced

---

[10]    It is important to remember that "[s]ubstantive evidence is that which is offered to establish the truth of a matter to be determined by the trier of fact. . . . Impeachment evidence, on the other hand, is that which is offered to 'discredit a witness . . . to reduce the effectiveness of [his] testimony by bringing forth evidence which explains why the jury should not put faith in [his] . . . testimony.'" *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 517 (5th Cir. 1993).

[11]    Defendant's argument that the video's value is limited to impeachment is, at best, disingenuous. Defendant continues to argue for the admission of the video to support his case-in-chief while simultaneous arguing that the

by the end of April 2016. Because Defendant failed to comply with the mandates of Rule 26(a), Defendant was sanctioned in accord with Rule 37(c)(1): I prohibited the use of the video at trial for substantive and impeachment purposes.

Now, to determine whether the exclusion of evidence was an appropriate sanction I must consider the four factors outlined by the Third Circuit in *Nicholas v. Pennsylvania State University*:

> "(1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation.

227 F.3d 113, 148 (3d Cir. 2000); *see also Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-5 (3d Cir. 1997). A court must also consider the importance of the evidence in question, which the Third Circuit has noted is "often the most significant factor." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298 (3d Cir. 2012).

Here, the production of the video at the pre-trial conference constituted a surprise. There is no dispute that the video was produced approximately sixteen (16) months late. Defendant's argument that the video was not a surprise suggests that I should have turned an otherwise fair trial into a "game of blind man's bluff." *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 683 (1958). Further, Defendant has not articulated a "cure" for the prejudice suffered due to the surprise. For example, Defendant did not move to delay trial to allow Plaintiff to depose those responsible for the delay of production or to depose those

---

use of the video would be solely for impeachment. Surveillance videos with *any* substantive value, like the one at issue here, must be turned over as an initial disclosure. *See, e.g.*, *Standley*, 783 F.3d at 1283; *Chiasson*, 988 F.2d at 517-18; *Klonoski*, 156 F.3d 255, 270.

responsible for the creation of the video. While Plaintiff has stated that they do not have reason to believe trial counsel acted in bad faith to delay the production of this video, I am concerned that the Attorney General's office was in possession of this tape for well over a year and neglected to produce it.[12] On these facts, the *Nicholas* factors suggest exclusion was appropriate.

Additionally, I acknowledge that the exclusion of critical evidence is "an extreme sanction," however, this video was not critical evidence. *Meyers*, 559 F.2d at 904-5. Defendant even admits that the video "does not change the identity of the witnesses or parties involved, or their testimony, nor does it add any new information regarding the scene of the incident, or the incident itself, that could not have otherwise been discovered or investigated without the video." (*Doc.* 92, at 10.) Thus, the "most significant factor" in this analysis also weighs in favor of finding exclusion appropriate.

Therefore, I find that it was appropriate to exclude the video as a sanction for Defendant's failure to comply with Rule 26(a)(1), and will deny Defendant Sheposh's motion for a new trial.

      (3)    <u>Instruction on False Arrest:</u>

Defendant Sheposh argues that he is owed a new trial because I refused to provide a jury instruction to clarify that there was no false arrest claim at issue. However, an additional instruction was not necessary because the charge provided to the jury outlined a single claim of excessive force.

Following closing argument, counsel for Defendant Sheposh requested "a limited instruction for the jury to instruct them [that] they are not to consider the veracity of the

---

[12]    Defendants' trial counsel, Ms. Davis, likely thought the lack of disclosure was equally concerning. She expressed to this Court that upon discovering that the tape had not been disclosed by prior counsel, she *immediately* informed Plaintiff and prepared the disclosure.

arrest of Mr. Mulero." (*Trans. III*, at 35); *see Winstead v. Hidenbrand*, 159 F.2d 25, (D.C. Cir. 1946) (explaining that oral requests for instructions under Rule 51 are valid). Counsel argued that this instruction was required because Plaintiff's counsel confused the issue before the jury when he injected the terms "probable cause" and "reasonable suspicion" into his closing argument.[13] The question before the jury was whether or not Defendant Sheposh had used excessive force, not whether Plaintiff was a victim of false arrest.

I denied Defendants' request for an additional instruction because the instructions provided made clear the jury had a single question before them. (*Trans. III*, at 35-36.) "A refusal to charge in the precise form [requested] is not error where the court covers the substance of the requested charge." *Arkwright Mut. Ins. Co. v. Philadelphia Electric Co.*, 427 F.2d 1273, at 1277 (3d Cir. 1970) (citing *Mannke v. Benjamin Moore & Co.*, 375 F.2d 281 (3d Cir. 1966)). Here, Defendants requested an instruction making clear that there was only one issue before the jury, that of excessive force. (*Trans. III*, at 35). The charge provided included instruction on excessive force and not false arrest. Further, the verdict slip specifically asks, "do you [the jury] find that [Defendant Sheposh] violated Mr. Mulero's Fourth Amendment right to be free from the use of *excessive force*?" (Doc. 69 (emphasis added).) There is simply no reference to false arrest in either the jury charge or the verdict slip.

Additionally, the statements made by Plaintiff's counsel are relevant to the excessive force inquiry. The Third Circuit in *Sharrar* clearly stated that one factor to be considered in determining if the force used was appropriate is the severity of the crime at issue. *See Sharrar*, 128 F.3d at 822; *see also Third Circuit Model Civil Jury Instructions*, ch. 4.9 (Oct. 2017). While on the stand, Defendant Sheposh explained that "[r]easonable suspicion is

---

[13]     Mr. Coleman, Plaintiff's counsel, disputes that he used the term probable cause. (*Doc.* 95, at 34.) The transcript shows he did. (Trans. III, at 10, 12-14.)

you have information that you believe a crime has been committed." (*Trans. II*, at 31). Defendant Sheposh continued to testify that he never had a reasonable suspicion that Plaintiff was engaged in criminal activity. (*Id.*) In light of the *Sharrar* factors, emphasizing this to the jury was appropriate and did not serve to confuse the issue.

For these reasons, Defendant Sheposh's motion for a new trial will be denied.

(4)    Remittitur of Compensatory Damages:

Defendant Sheposh argues that I should remit Plaintiff's compensatory damages award from $250,000 to $1. He claims that the evidence provided at trial cannot support such an award. Stated differently, Defendant Sheposh argues that this award shocks the conscience. *See Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989) (to alter a jury verdict the jury's award "must be so unreasonable as to offend the conscience of the Court.").

When there is little or no evidence presented at trial documenting emotional distress, courts have remitted the entirety of a compensatory damages award premised on emotional distress. *See, e.g.*, *Spence v. Bd of Educ. of the Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986); *Gunby v. Pa., Elec. Co.*, 840 F.2d 1108, 1120-22 (3d Cir. 1988). For example, in *Spence v. Board of Education*, the Third Circuit considered the remittitur of a compensatory damages award for a First Amendment retaliation claim premised on emotional distress. There, a plaintiff testified that she was "depressed and humiliated" by the actions of a defendant. *Spence*, 806 F.2d at 1201. The plaintiff offered no additional evidence to support her claim for emotional distress: she did not testify that she sought professional psychiatric counseling and did not elicit testimony from others about her behavior.[14] *Id.* Thus, when the Court rejected her argument that emotional distress may be

---

[14]    Notably, the *Spence* Court specifically stated that it was not deciding "whether a verdict for emotional distress may ever be supported solely by

presumed, plaintiff was left with no evidence to independently support her claim for emotional distress. Therefore, remittitur of the entirety of her award related to emotional distress was affirmed. *Id.*

Conversely, when evidence of emotional distress exceeds that of *Spence*, an award of compensatory damages has been affirmed. *See, e.g.*, *Bolden v. Se. Pa. Tansp. Auth.*, 21 F.3e 29, 30-34 (3d Cir. 1994); *Ridley v. Costco Wholesale Corp.*, 217 Fed App'x 130, 136-37 (3d Cir. 2007) (affirming $200,000 emotional distress award based on testimony of plaintiff and his spouse, but absent any physical evidence or expert testimony); *Blakey v. Continental Airlines*, 992 F. Supp. 731, 735, 741 (D.N.J. 1998) (remitting $500,000 emotional distress award to $250,000 where the plaintiff presented limited expert testimony and offered evidence documenting limited treatment for emotional distress); *Wade v. Colaner*, No. 6-3715, 2010 WL 5479629, at *30 (D.N.J. Dec. 28, 2010) (affirming a compensatory damages award of $200,000 for emotional distress resulting from the unconstitutional use of excessive force where Plaintiff provided evidence documenting the effects of his distress). In *Bolden v. Southeastern Pennsylvania Transportation Authority*, a jury awarded compensatory damages of $250,001 for emotional distress. *See* 21 F.3d at 31. There, a plaintiff claimed he suffered emotional distress after being subject to a mandatory, unconstitutional drug screening. *Id.* at 30. In support of his claim of emotional distress, plaintiff elicited testimony from two friends, his wife, and his daughter who explained that plaintiff "changed a great deal" following the drug screening. *Id.* at 33. The number of witnesses testifying to plaintiff's permanent emotional change led the trial court to deny a request for remittitur. The Third Circuit affirmed and explicitly noted that its holding in *Spence* was inapplicable on these facts. *Id.* at 33-34.

---

plaintiff's own testimony." 806 F.2d at 1201. Rather, the Court held that this plaintiff's testimony was insufficient. *Id.*

Courts have also remitted cases where the evidence presented was greater than that offered in *Spence*, but not as significant as that offered in *Bolden*. *See, e.g.*, *Glass v. Snellbaker*, No. 5-1971, 2008 WL 4371760, at *19-20 (D.N.J. Sept. 17, 2008). In *Glass v. Snellbaker*, a plaintiff sought compensatory damages for emotional distress resulting from a claim of First Amendment retaliation. *Id.* In retaliation for plaintiff's protected speech, he was transferred from a prestigious position to one that was relatively mundane. He testified that he felt humiliated and was emotionally devastated. *Id.* at *20. As a result of his transfer, he also testified that he was prescribed additional medication to treat his pre-existing problem with high blood pressure. *Id.* at *21. The jury awarded this plaintiff $250,000 for mental and emotional harm. *Id.* at *19. The award was subsequently reduced by the trial court to $50,000. *Id.* at *20.

As a threshold matter, I disagree with Defendant in so far that he suggests there was no evidence presented in support of compensatory damages. There was evidence submitted to the jury–namely through the testimony of the Plaintiff–which suggested that Plaintiff suffered emotional distress due to Defendant Sheposh's actions. For example, Plaintiff explained that he suffered from depression and anger following the incident with Defendant Sheposh. Specifically, he noted that he sought professional support from a social worker at a local Veteran's Hospital because the depression was "eat[ing] at [him]." Further, he explained, with significant emotion, that he was in a custody dispute with his former wife and was worried about losing his children due to these events. (*Trans. I*, at 156.) While this evidence is far from overwhelming, it amounts to more evidence than was presented in *Spence*.[15] Stated differently, the evidence presented is sufficient to support some amount

---

[15]     Plaintiff Mulero testified that he sought professional help for his depression and anger issues resulting from the interaction at issue. The failure of the plaintiff in *Spence* to make such a similar statement was explicitly considered by the Third Circuit when determining that remittitur

of compensatory damages.

However, the amount of compensatory damages awarded in this case is shocking to the judicial conscience. Plaintiff has not produced multiple witnesses to testify about his change in behavior, and has not submitted any physical evidence that serves to illustrate the emotional distress he suffered. Thus, less evidence was presented here than in *Bolden*. But, the evidence presented by Plaintiff was more significant than the evidence presented in *Glass*. Remember, the only evidence outside of the *Glass* plaintiff's testimony regarding humiliation was that he was treated for a pre-existing medical condition. Here, Plaintiff testified that he sought professional psychiatric help from a social worker at a Veteran's Hospital because of Defendant's conduct. Because it must be acknowledged that the evidence provided here falls somewhere between that provided in *Bolden* and *Glass*, I find that remittitur is necessary.

For these reasons, I will find that an award of $125,000 is the highest possible recovery that would no longer be shocking to the judicial conscience based upon the evidence presented at trial, and therefore remittitur of $125,000, or fifty-percent (50%) of the award, is appropriate.

## B.  Plaintiff Mulero's Motion For Attorney Fees and Costs[16]

A district court may award "the prevailing party . . . a reasonable attorney's fee" in a case arising under 42 U.S.C. § 1983. 42 U.S.C. § 1988(b); *see also Evans v. Port Auth. of N.Y.*, 273 F.3d 346, 358 (3d Cir. 2001). When providing such a fee, "[a] district court may

---

of the entire award was necessary. 806 F.2d at 1201.

[16]  No hearing was required to resolve Plaintiff's request for attorney's fees. This case is like one of the "many fee applications [that] are decided on the basis of affidavits without the need for a hearing." *Blum v. Witco Chem. Corp.*, 829 F.2d 367, 377 (3d Cir. 1987); *see also J.S. ex rel. Snyder v. Blue Mountain School Dist.*, No. 07-585, 2014 WL 1321116, at *4 (M.D. Pa. March 31, 2014).

not set attorney's fees based on a generalized sense of what is usual and proper but 'must rely upon the record.'" *Evans*, 273 F.3d at 361 (quoting *Smith v. Philadelphia Housing Authority*, 107 F.3d 223, 226 (3d Cir. 1997). Once the court determines the reasonable hourly rate, it multiplies that rate by the reasonable hours expended to obtain the lodestar. The lodestar is presumed to be the reasonable fee. *Blum v. Stenson*, 465 U.S. 886, 897 (1984). "The party seeking attorney's fees has the burden to prove that its request for attorney's fees is reasonable." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990).

Here, Defendant challenges Plaintiff's fee petition in three respects. First, Defendant claims the billing rate offered by the Plaintiff is too high. Second, Defendant claims Plaintiff achieved only limited success at trial when compared to the claims originally levied in the Amended Complaint. Accordingly, Defendant requests Plaintiff's fee award be reduced by thirty percent (30%). Finally, Defendant argues that the total fee award should be reduced by ten percent (10%) because a single billing rate was used for all hours recorded by Plaintiff's counsel.

(1)    Billing Rate:

To determine a reasonable hourly billing rate, courts apply a burden-shifting analysis. *See Evans*, 273 F.3d at 361. First, the plaintiff bears the burden of establishing a prima facie case by producing sufficient evidence of what constitutes the prevailing market rate "for the essential character and complexity of the legal services rendered.[17]" *Smith*, 107 F.3d at 225; *see also Rode*, 892 F.2d at 1183. A reasonable market rate is "calculated according to the prevailing market rates in the relevant community." *Rode*, 892 F.2d at 1183

---

[17]    Evidence of a reasonable rate may start with an attorney's usual billing rate. *See Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 374 (3d Cir. 2004). Then, that evidence is compared with the rates of other similarly qualified lawyers in the area. This evidence often comes in the form of affidavits from other attorneys. *See Carey v. City of Wilkes-Barre*, 496 Fed. Appx. 234, 236-37 (3d Cir. 2012) (citing Evans, 273 F.3d at 360-61).

(citing *Blum*, 465 U.S. at 895). The court "should assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir. 2001) (citations omitted). A court may also consider the relative simplicity of the case, the quality of counsel's moving papers, and "its perception of counsel's skill and experience during the trial of the underlying matter." *Mantz v. Steven Singer Jewelers*, 100 F. App'x 78, 81-82 (3d Cir. 2004) (affirming district court's reduction of requested hourly rate based on the "relative simplicity of [the] case, its barely successful outcome when one considers the amount of money sought by the plaintiff, and [plaintiff's counsel's] skill as observed by this Court at trial and in the pleadings he has submitted"); *Bell v. United Princeton Props., Inc.*, 884 F.2d 713, 719 (3d Cir. 1989) (explaining that a court may "reduce requested fees with respect to matters within the judge's personal knowledge").

Once a plaintiff establishes their prima facie case, the defendant may contest the reasonableness of the rate with "appropriate record evidence." *Evans*, 273 F.3d at 361. Once the defendant raises objections to the fee request, the district court has a "great deal of discretion" to adjust the fee award in light of those objections. *Rode*, 892 F.2d at 1183.

Here, Plaintiff requests an hourly rate of $400 for Attorney Harry Coleman, $250 for Attorney John Lawler, and $100 for Paralegal Leigh Gerardi. Defendant specifically objects to the rates of Mr. Coleman and Mr. Lawler. Notably, the hourly rate assigned to Ms. Gerardi has not been challenged.[18]

> *(I)    Attorney Harry Coleman*:

Plaintiff requests an hourly rate of $400 for Attorney Harry Coleman. Defendant

---

[18]    A fee award will not be decreased based on factors not raised by the adverse party. *See Rode*, 892 F.2d at 1183. Therefore, the $100 hourly rate for Gerardi will not be reviewed.

argues this rate should be reduced to $375.

Mr. Coleman is a skilled civil rights litigator. He is a graduate of Scranton University and Widener University Law School. (*Doc.* 74-1, at 2.) Further, he began working in private practice in 1989 and has since litigated over 200 cases before this Court. (*Doc.* 74-1, at 2-3.) Mr. Coleman's practice focuses on the "defense of complex public entity civil rights and constitutional claims." (*Doc.* 74-1, at 2.) While Mr. Coleman generally serves as defense counsel, he is also "retained privately by plaintiffs who have been aggrieved by governmental entities or actors." (*Doc.* 74-1, at 4.) His regular billing rate is $450 per hour. (*Id.*)

In addition to his own affidavit, Mr. Coleman has produced declarations from four other attorneys practicing in the Middle District: Attorneys Barry H. Dyller, David W. Saba, Joseph T. Wright, Jr, and Gerard M. Karam.

First, Mr. Dyller notes that he is "aware of hourly rates in the Wilkes-Barre-Scranton area," and believes Attorney Coleman's requested hourly rate of $400 is "consistent with prevailing hourly rates in this geographic area." (*Doc.* 74-2, at 2.) Like Mr. Coleman, Mr. Dyller has been practicing in the Middle District for over 20 years and traditionally bills at a rate of $450 per hour. (*Id.* at 1-2.) Notably, I recently reduced a fee request made by Mr. Dyller from $450 per hour to $375 per hour. *See Borrell v. Bloomsburg University*, 207 F. Supp 3d 454, 509 (M.D. Pa. 2016). In that case, Mr. Coleman submitted a declaration explaining that "an attorney in Luzerne/Lackawanna County area would receive $350 per hour for [a civil rights case]." *Id.*

Next, Mr. Saba states that he believes a rate of $400 per hour is "reasonable and appropriate." (*Doc.* 74-3, at 4.) This inquiry, however, is not one of reasonableness. Rather, Plaintiff is tasked with establishing the prevailing market rate for a skilled civil rights attorney in the Middle District. *See Malldonado v. Houston*, 256 F.3d 181, 184 (3d Cir. 2001) (citing

24

*Blum*, 465 U.S. at 895). Mr. Saba's declaration provides no useful evidence to determine the prevailing market rate. Indeed, he did not provide his own hourly rate. Thus, Mr. Saba's declaration does not support for Mr. Coleman's proposition that the prevailing market rate is $400 per hour. Similarly, the declarations of Mr. Wright and Mr. Karam neglect to discuss the prevailing market rate in the Middle District in favor of addressing the reasonableness of the requested fee. (*Docs.* 74-4; 75.) These declarations also fail to provide the attorneys' hourly rates. Again, such declarations are not particularly helpful in this analysis.

I find that Plaintiff has failed to produce sufficient evidence to satisfy his burden of establishing a prima facie case that his requested hourly rate of $400 is consistent with the prevailing market rate. For this reason, I must conduct my own analysis to determine what award is reasonable. *See Carey v. City of Wilkes-Barre*, 496 Fed. App'x 234. 237 (3d Cir. 2012).

Defendant suggests an hourly rate of $375. This rate is equal to the rate I provided Mr. Dyller, and greater than the rate advanced for by Mr. Coleman in *Borrell*. *See* 207 F. Supp 3d at 510-11. Mr. Dyller has practiced in the Middle District for over 20 years, focused his practice on civil rights issues, and traditionally charges his clients an hourly rate of $450. Mr. Coleman has also practiced in the Middle District for over 20 years, focused his practice on civil rights and constitutional litigation, and traditionally charges clients an hourly rate of $450. Thus, they are attorney's of similar skill and experience. Further, *Borrell*, like the instant action, was a civil rights case. There, I reduced Mr. Dyller's requested rate of $450 to $375. I can think of no reason not to do the same here.

Based on the evidence before me and my knowledge of this case, I find Plaintiff's requested hourly rate of $400 for Mr. Coleman to be above the prevailing market rate and thus greater than reasonable. Further, I find Defendant's proposed hourly rate of $375 reasonable. Therefore, I will use an hourly rate of $375 to calculate lodestar.

Plaintiff requests an hourly rate of $250 for Attorney John Lawler. Defendant argues this rate should be reduced to $225.

Mr. Lawler has extensive litigation experience. He graduated from Widener Law School in 1994 and has since focused his practice of law on general civil litigation and criminal defense. (*Doc.* 74-1, at 4.) Mr. Lawler served as an Assistant District Attorney for the Lackawanna County District Attorney's Office and served as a defense attorney in the Lackawanna County Public Defender's Office. (*Id.*) Currently, Mr Lawler serves as the Solicitor for the Carbondale Area School District. (*Id.*) While Mr. Lawler appears to be an experienced litigator, Plaintiff has provided no evidence to suggest Mr. Lawler has any particular experience litigating civil rights or constitutional claims.

Plaintiff has supplied this court with no evidence suggesting that a rate of $250 constitutes the prevailing market rate for an attorney with Mr. Lawler's experience. For this reason, I find that Plaintiff has failed to produce sufficient evidence to satisfy his burden of establishing a prima facie case that his requested hourly rate of $250 is consistent with the prevailing market rate. Again, I am required to determine what award is reasonable. *See Carey*, 496 Fed. App'x at 237.

Citing again to *Borrell v. Bloomsburg*, Defendant argues that an hourly rate of $225 is reasonable. In *Borrell*, the plaintiff not only requested fees for Mr. Dyller, but also for another attorney who worked for Mr. Dyller: Ms. Shelly Centini. *See* 207 F. Supp 3d at 511. Ms. Centini had graduated law school and was employed by Mr. Dyller. *Id.* She had extensive trial experience, but her support of Mr. Dyller in *Borrell* was limited to pre-trial matters. *Id.* Specifically, she revised drafts, researched legal issues, and consulted with Mr. Dyller. *Id.* Notably, there was no evidence that Ms. Centini had any specific experience litigating civil rights claims. Under these circumstances, I found a hourly rate of $225 dollars

to be a reasonable rate. *Id.*

Here, Mr. Lawler's activity was not as limited as that of Ms. Centini. On a number of occasions Mr. Lawler made appearances before this Court. (Doc. 74-1, at 38, 45, 49, 60.) In fact, he appeared to be an active participant at trial, and he appears to have even met privately with Plaintiff Mulero. (*Id.*) Unlike Ms. Centini, Mr. Lawler was not a pre-trial ghost writer, but rather an active member of Plaintiff's defense team. For this reason, I find that Mr. Lawler is owed an amount greater than Ms. Centini. But, that amount should not be so significant to confuse Mr. Lawler with a highly experienced lawyer sitting first chair at trial. Stated differently, his rate should not climb to the heights of $300 per hour. *See J.S.,* 2014 WL 1321116, at *6-7 (finding rates reaching $300 per hour were reserved for highly qualified attorneys leading a case); *see also Spicher v. Artwork Factory*, 2016 WL 3670877, at *9 (M.D. Pa. July 11, 2016) (explaining that rates between $250 and $300 were appropriate for associate attorneys with specialized skill sets).

Based on the evidence before me and my knowledge of this case, I find Plaintiff's requested hourly rate of $250 for Mr. Lawler to be reasonable. Therefore, even though Plaintiff failed to establish its prima facie case, I will use an hourly rate of $250 to calculate lodestar.

(2)      Hours Billed:

Defendant does not contest the hours billed by either Mr. Coleman or Mr. Lawler. Because Defendant has not objected on this ground, it will not be considered. *See Rode*, 892 F.2d at 1183.

(3)      Lodestar Calculation:

Once the court determines the reasonable hourly rate, it multiplies that rate by the reasonable hours expended to obtain the lodestar. The lodestar fee is presumed reasonable. *See Rode*, 892 F.2d at 1183.

Plaintiff seeks $116,730 in attorney fees based on 291.9 hours billed by Mr. Coleman at an hourly rate of $400; $30,050 in attorney fees based on 120.2 hours billed by Mr. Lawler at an hourly rate of $250; and $9,260 based on 92.6 hours billed by Ms. Gerardi at an hourly rate of $100. Additionally, Plaintiff seeks $1,467 in costs and expenses.[19] Thus, Plaintiff seeks a total award of $157,507.40. However, Mr. Coleman's hourly rate has been reduced from $400 to $375. Accordingly, Mr. Coleman is owed $109,462.50 in attorney's fees, not $116,730.

Therefore, the lodestar is calculated to total $150,239.50.[20]

(4)    Additional Reduction of Plaintiff's Fee Award:

(i)    *Success of Plaintiff's Claims*:

Defendant argues that Plaintiff's fee petition should be reduced by thirty percent (30%) because Plaintiff was not successful on all claims originally outlined in his Complaint.

The Third Circuit has explained that, when possible, a district court should award fees commensurate with the hours spent litigating *successful* claims. *See, e.g.*, *Loughner v. University of Pittsburgh*, 260 F.3d 173, 178 (3d Cir. 2001); *Institutionalized Juveniles v. Secretary of Public Welfare*, 758 F.2d 897, 919 (3d Cir. 1985). However, the Circuit has also noted that there is no need to separate the hours spent litigating successful claims as opposed to unsuccessful claims if the claims "involve a common core of facts or related legal theories." *Northeast Woman's Health Center v. McMonagle*, 889 F.2d 466, 476 (3d

---

[19]    Defendant Sheposh does not object to the costs and expenses requested.

[20]    The parties have not requested adjustments to the Lodestar calculation pursuant to the factors outlined by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974); *see also Hensley*, 461 U.S. at 434-37 (explaining that a court's assessment of attorney fees may not end with the lodestar calculation). I will not make any adjustment in light of those factors because the parties have made no such request, and I find that the lodestar calculation is reasonable in light of the results obtained.

Cir. 1989); *see also Hensley v. Eckerhart*, 461 U.S. 424, 439 (1983) (emphasizing that a reduction for unsuccessful claims is warranted only when they were "distinct in all respects" from claims on which the party did succeed.); *Rode*, 892 F.2d at 1183 (same).

Here, I acknowledge that Plaintiff's success at trial was greatly limited when compared to his original complaint. However, I will not reduce the fee request. Plaintiff made every attempt to reduce the hours required on claims that were less likely to be successful. Remember, Plaintiff stipulated on two separate occasions to dismiss claims and parties from this case to streamline litigation. Ultimately, Plaintiff stipulated to the dismissal of three parties and pursued a single claim of excessive force against the remaining Defendants. The claim against Defendant Sheposh and Defendant Walsh stemmed from the same operative facts, and the legal theories present in this action were identical with respect to both Defendants. Accordingly, I will not reduce Plaintiff's fee request.

(ii)     *Single Billing Rate*:

Finally, Defendant contends that the fee award should be reduced by ten percent (10%) to account for the time spent on tasks which do not warrant compensation at the full hourly rate. To support this reduction, Defendant argues that "a claim by a lawyer for maximum rates for telephone calls with a client, legal research, a letter concerning a discovery request, the drafting of a brief, and trial time in court is neither fair nor reasonable." *Loughner*, 260 F.3d at 180. But, Defendant Sheposh has not identified the problematic billing entries or suggested any alternative rate schedule for less complex tasks. Instead, Defendant seeks a seemingly arbitrary reduction of Plaintiff's fee award by ten percent (10%).

Defendants are not burden-less in this analysis: "[t]he opposing party bears the burden of producing record evidence that will contest" the rate used. *McCutcheon v. Am.'s Servicing Co.*, 560 F.3d 143, 150 (3d Cir. 2009). Put simply, Defendant's suggestion to

arbitrarily reduce the fee award is insufficient to overcome this burden. *See Ford v. Cnty. of Hudson*, 2017 WL 947304, at *3-4 (D.N.J. Mar. 8, 2017) (applying a single rate "across the board" when defendants did not suggest a concrete alternative). Therefore, the rate will not be reduced.

### III. Conclusion

As discussed at length above, Defendant Sheposh's renewed Rule 50(b) motion and request for a new trial will be denied. Further, Defendant's request for remittitur will be granted in part and denied in part. Finally, Plaintiff's Motion for Attorney's Fees and Costs will be granted in part and denied in part.

An appropriate order follows.


February 28, 2018                                    /s/ A. Richard Caputo
Date                                                 A. Richard Caputo
                                                     United States District Judge